**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 26-cr-240-WJM-05

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MATTHEW TAFOYA,
2. ADRIAN LEWIS,
3. STEPHEN CHRISTOPHER ARCHULETA JR.,
4. BRIANA BARTON,
5. **ANTHONY DAVID,**

Defendants.

---

## ORDER REVOKING MAGISTRATE JUDGE'S RELEASE ORDER

---

This matter is before the Court on the Government's Emergency Motion for Stay and Revocation of Magistrate Judge's Order Authorizing Pretrial Release ("Release Order"). (ECF No. 43) ("Motion"). Defendant Anthony David filed a response (ECF No. 53), to which the Government filed a reply (ECF No. 57).

The Court previously granted that portion of the Motion which sought a stay of the Release Order. (ECF No. 51.) For the following reasons, the Court now grants that portion of the Motion which seeks revocation of the Release Order.

## I. BACKGROUND[1]

This case arises out of the sale of methamphetamine and firearms to an undercover

---

[1] This Background is derived from the parties' briefs on the Motion, the documents submitted in support thereof, and the proffered evidence adduced at the November 12, 2026 evidentiary hearing. All citations to docketed materials are to the page number in the CM/ECF heading, which sometimes differs from a document's internal pagination. In addition, quotations

agent ("Agent"). Over the course of several months, David and his co-defendant Adrian Lewis (jointly, "Defendants") took part in a series of video calls with Agent about selling methamphetamine and firearms. Defendants would call Agent from David's home. (Tr. 32–33.) While Lewis "brokered the deals with the undercover agent, . . . it was Anthony David who actually built the firearms and supplied the firearms to Mr. Lewis to provide to the undercover agent." (*Id.* at 32:13–15.) David's job was to "tune those firearms, to make sure they functioned as fully automatic weapons." (*Id.* at 84:8–10.)

On July 13, 2026, Lewis agreed to sell two pounds of methamphetamine to Agent and told Agent he had access to an "arsenal" and "could distribute various heavy weaponry" to him. (ECF No. 43 at 3.)

In late July 2026, David joined Lewis on a Signal video call with Agent to discuss the sale of firearms. (*Id.* at 4.) Lewis and Agent discussed various firearms, but when Agent started asking more detailed questions about the firearms, Lewis replied that he needed to have his partner, whom he considered more well-versed in firearms, participate in the call. (*Id.*) David then joined the call. (*Id.*) During the call, David "and Lewis showed the [Agent] a gold-plated AK-47 rifle and AR-15 builds. They also discussed various firearms they had and the prices they were willing to sell them for." (*Id.*) Lewis also discussed selling an additional two pounds of methamphetamine to Agent, and they planned to conduct the transaction on August 4. (*Id.*)

On August 2, Lewis told Agent he needed to go to Black Forest, to secure the firearms for the transaction. (*Id.*; *see* Tr. 14:13–23.) According to Lewis's cell phone

---

from the evidentiary hearing are taken from the rough draft of the transcript ("Tr.") prepared by the Court Reporter, which is subject to revision before it is finalized.

location data, he went to David's home in Black Forest after telling Agent this information. (Tr. 14:13–23.)

On August 4, Lewis and Agent met at "a public location in Colorado Springs." (*Id.* at 15:5–6.) Lewis opened his trunk, revealing "a large Pelican rifle case" that contained "a number of handguns and rifles, at least one of which [Agent] could tell was loaded." (*Id.* at 15:9–14.) Agent asked Lewis detailed questions about the weapons, to which Lewis pled ignorance and said he needed to call the other individual to answer the questions. (*Id.* at 16:3–9.) Lewis then called David over a Signal video call, and David "provided that [A]gent with detailed specifications about the firearms that Mr. Lewis had in his possession at this particular meeting." (*Id.* at 16:11–15.) Lewis then sold Agent "approximately two pounds of methamphetamine and two semi-automatic rifles." (ECF No. 43 at 3.)

At some point this past August, one of David's co-defendants ("Co-Defendant") and Co-Defendant's former romantic partner ("Ex-Partner") were in an altercation at David's home. (Tr. 40:5–9.) According to Co-Defendant, Co-Defendant and Ex-Partner were pushing and shoving each other in a "food fight," whereas according to Ex-Partner, it had escalated to the point where Co-Defendant was strangling Ex-Partner. (*Id.* at 40–41.) With the butt of a rifle, David struck the back of Co-Defendant's head. (*Id.* at 41:8–11.) A struggle ensued between the two, culminating in David shooting the back of Co-Defendant's right thigh. (*Id.* at 41–42.) David then pointed another handgun at Co-Defendant's chest threatened to "pop three" bullets into Co-Defendant's chest. (*Id.* at 42:2–5.) David drove Co-Defendant and Ex-Partner to the hospital and warned Co-Defendant not to tell anyone what happened. (*Id.* at 42:18–25.)[2]

[2] Although David was not indicted for the shooting, the Government proffered it as evidence

Later, on September 25, 2026, David participated in another Signal video call with Lewis and Agent. (ECF No. 43 at 4.) Agent asked about "switches," which are "an aftermarket device that converts a semi-automatic firearm into a fully automatic weapon." (*Id.*) Lewis said they had "lower receivers that would accept the installation of the 'switch' " and David said the switch needed to be modified "so that it would fit into the firearm and function as a fully automatic weapon." (*Id.* at 4–5.) "While [David] remained on the video call, Lewis and the [Agent] agreed to meet [to] conduct a methamphetamine and firearm transaction. That transaction never took place because federal agents arrested Lewis in connection with this case" later that day. (*Id.* at 5.)

On October 2, 2026, FBI agents executed a search warrant on David's home. (*Id.*) There, they found firearms, tens of thousands of rounds of ammunition in various calibers, large metal ammunition boxes, magazines, ballistic helmets, ballistic shields, flash suppressors, various firearms components, and military-grade body armor. (*Id.* at 5–6; Tr. 24:25.) Lewis knew of at least 50 firearms on David's property before the execution of the warrant. (Tr. 34:6–8.) But the agents could only find 9 firearms, which included some handguns, rifles, and a grenade launcher. (ECF No. 43 at 5.)

One officer found a room concealed "[b]ehind a washer and dryer area." (Tr. 26:4–6.) The room was not "visible from the main basement area." (*Id.*) In the room, the agent found a blue suitcase containing multiple firearm receivers, upper assemblies, bolts, barrels, rifle barrel components, and pistol components. (*Id.* at 26:6–11.) According to a Colorado Springs police report, the room appeared to be a methamphetamine laboratory and gun factory. (*Id.* at 25:14–25.) The Government believes that the chemicals

---

of David's dangerousness.

contained in the laboratory were "precursors associated with manufacturing triacetone triperoxide ('TATP')," which "is a homemade explosive. . . . [that] is difficult for traditional security scanners to detect" and "has been used in a variety of terrorist bombing[s]." (ECF No. 43 at 6.) But these chemicals are also "common chemicals that . . . have a multitude of purposes," i.e., "alternative innocent purposes." (Tr. 28:11–24.) David was at home and was arrested. (ECF No. 43 at 5.)

In the Pretrial Services Report, the Probation Office recommended that David be released on an unsecured bond of $10,000 with enumerated conditions. (ECF No. 64 at 12.) According to the Pretrial Services Report, David denied any gang affiliation but admitted that he had a swastika tattoo, which he said was a mistake from when he was previously incarcerated. (*Id.* at 10.)

On October 13 and 27, 2026, Magistrate Judge Timothy P. O'Hara held a detention hearing. (ECF Nos. 9 & 41.) Judge O'Hara ordered David released to a halfway house subject to GPS monitoring and required treatment for his substance abuse issues. (ECF No. 56 at 13–20.) Judge O'Hara then entered the written Release Order, which "is meant to supplement, not supplant, the factual findings and rulings made on the record at the Detention Hearing." (ECF No. 52 at 2.)

The Government filed the Motion, asking the Court to revoke the Release Order because it argues David "presents a serious danger to community safety and there is no condition or combination of conditions that will reasonably assure otherwise." (ECF No. 43 at 15.) After reviewing the parties' briefing on the Motion, the Court held an evidentiary hearing during which both parties proffered evidence to help the Court decide whether pretrial release or detention for David is appropriate. (ECF No. 73.)

## II. LEGAL STANDARDS

### A. Bail Reform Act

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). Thus, under the Bail Reform Act, a defendant may be detained pending trial only if a judicial officer finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The judicial officer may make such a finding only after holding a hearing according to the procedures specified in § 3142(f). The Government bears the burden of proving risk of flight by a preponderance of the evidence and dangerousness to any other person or to the community by clear and convincing evidence. § 3142(f).

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### B. Standard of Review

Both defendants and the Government may appeal a magistrate judge's release order to the district judge. 18 U.S.C. § 3145(a). The district judge then reviews the magistrate judge's decision *de novo*. *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003).

> *De novo* review, however, does not necessarily mean holding an evidentiary hearing. Although a district court may start from scratch and take evidence, it may also review the evidence that was before the magistrate judge and make its own independent determination as to whether the magistrate judge's findings and detention order are correct. This is a matter of discretion for the district court.

*United States v. Romero*, 2010 WL 11523871, at *2 (D. Colo. May 17, 2010) (internal quotation marks and citations omitted).

## III. ANALYSIS

The Government asks the Court to revoke the Release Order, contending that David poses so dangerous a threat to the community that no set of conditions on release would suffice to dampen that threat. After carefully considering the totality of the evidence in this case, the Court concludes the Government has met its burden under § 3142(e) by clear and convincing evidence, and as a consequence it will reverse the Release Order.

The Court of course reviews the parties' proffers of evidence in light of the factors

set forth in § 3142. As a preliminary matter, the Court notes that the Government has conceded that David poses no risk of flight (Tr. 85–86), so it will cabin its analysis accordingly.

First, the nature and circumstances of the offense weigh in favor of detention. The Government charged David for alleged violations of 18 U.S.C. §§ 924(h) and 922(g)(1), offenses both involving firearms. Simply put, that the charged offenses involve firearms favors detention. *See* 18 U.S.C. § 3142(g)(1).

Second, turning to the weight of the evidence against David, the Court agrees with Judge O'Hara: "The weight against [David] appears to be strong. The . . . weapons were found in his home, and there's video evidence of him supporting weapons transactions. That's strong evidence." (ECF No. 56 at 15:5–8.) In the Court's view, the two strongest pieces of evidence in this case favoring detention are the video calls and the physical evidence found at David's home pursuant to the federal search warrant. The Court notes the Government has audio recordings of the video calls wherein David is "discussing building guns and selling guns." (Tr. 100:5–11.) Furthermore, Agent participated in both the video calls and the execution of the federal warrant and pinpointed David's home as Defendants' location during the video calls. (Tr. 11–12.)

With respect to the physical evidence found upon the execution of the search warrant, recall that law enforcement recovered a slew of firearms, firearm accessories, ammunition, and armor at David's home. (ECF No. 43 at 5–6.) And in this house teeming with instruments of war, law enforcement also located a laboratory "semi-buried on the premises." (Tr. 31:4–6). The Government argues that David was preparing to manufacture explosives there because the chemicals found there were believed to be

TATP precursors. (ECF No. 43 at 6.)

But as the Court stated during the evidentiary hearing, the Government's argument concerning the possible TATP precursors is by far its weakest argument, because it is almost pure speculation. (Tr. 56–57.) And as the Government conceded, the possible TATP precursors "are common chemicals that . . . have a multitude of purposes, . . . .[so there is] no proffer that [the Government] can make to the Court, that Mr. David was indeed manufacturing TATP." (Tr. 28:11–16.) As David put it, "just having [common chemicals] doesn't mean you are creating a bomb." (Tr. 55:10–11.)

Independent of the possible TATP precursors, however, David had a significant quantity of weaponry—designed for military-style conflicts—stashed away in his home. And so, even assuming that David was not in the process of creating a bomb, the weight of the evidence against him is strong, and that weight strongly supports detention.

Third, with respect to David's history and characteristics, the Court is especially concerned with his expertise in assembling firearms, which the evidence has amply established by a preponderance of the evidence. Much of the evidence points to David's expertise in this area. For one, that David possessed a huge arsenal indicates more than just a passing familiarity with firearms. This in turn corroborates the evidence that David possesses both the skill and experience to assemble firearms from legal, nontraceable components. And that he concealed a room full of firearm components would lead a reasonable person to draw this conclusion as well. Also, during the multiple interactions with Agent, Lewis consistently made references to needing David's assistance to answer complex questions about firearm specifications. (*See, e.g.*, ECF No. 43 at 4.). Indeed, Lewis confirmed that not only is David "very knowledgeable [about] firearms, [he] knows

how to build firearms." (Tr. 32:8–9.)

Moreover, as described in the Pretrial Services Report, David's criminal history consists of five misdemeanor convictions and three felony convictions, including a federal conviction. (ECF No. 64 at 11.) His criminal history, even when limited to the federal conviction in this District, is troubling. In a 1993 case presided over by Judge Daniel B. Sparr of this District, David pleaded guilty to "conspiracy to manufacture methamphetamine," "possession of an unregistered explosive device," "using a firearm during and in relation to a drug trafficking crime," and being a "felon i[n] possession of a firearm." Plea Agreement and Stipulation of Facts at 1, *United States v. David*, No. 93-cr-372-DBS (D. Colo. Feb. 24, 1994), ECF No. 112 ("1993 Plea"); *see United States v. David*, 106 F.3d 414 (10th Cir. 1997) (appeal of 1993 Plea) (unpublished). There, David, along with others, set up a secret laboratory in a barn to manufacture four pounds of methamphetamine. (1993 Plea at 3.) Just as here, law enforcement agents seized the methamphetamine laboratory, and at least ten firearms. (*Id.* at 3–4.) "Agents further discovered and seized a destructive device, . . . an explosive bomb[,] which was located in the barn on the property." (*Id.* at 4–5.) It is very troubling to the Court that the underlying facts and charged offenses in the 1993 case are materially similar to the facts and charged offenses here. Even 33 years later, that David once again stands before this Court accused of not only nearly identical charges, but nearly identical conduct, also favors pretrial detention.

The Court next considers the August 2026 domestic altercation shooting which took place at David's residence. At the evidentiary hearing, David's counsel attacked Co-Defendant's credibility as to the facts of this shooting because Co-Defendant's and Ex-

Partner's accounts contradict each other. For example, Ex-Partner has seen David handle firearms but does not think he can manufacture them. (Tr. 58:8–10.) But even disregarding Co-Defendant's and Ex-Partner's accounts, the evidence against David, considered under the § 3142 factors, is overwhelming at this point. In other words, Co-Defendant's and Ex-Partner's credibility, or lack thereof, is inconsequential to determining whether pretrial release or detention is appropriate.

The Court also considers several other of David's characteristics. David argues his age (65 years old), his "long standing ties to the community" (living in Colorado Springs for 47 years), "his reliance on income from Supplemental Security Income (SSI), and lack of mental health issues" favor release. (ECF No. 53 at ¶ 14; *see* ECF No. 52 at 4 (Judge O'Hara's corresponding findings).) Although the Government discounted some of David's physical health problems as being unverified by the Pretrial Services Report, (ECF No. 43 at 12), Judge O'Hara noted David's "health issues, including a distended hernia, possible heart condition, and chronic back issues," in ordering his release. (ECF No. 52 at 4.).

The Court agrees that these characteristics favor release. But the Court is also concerned about the hateful Nazi swastika symbol David has tattooed on his body, which he admitted to and expressed regret for to a probation officer. The Government's evidence proffered in this case and David's concerning criminal history, however, overcome the those factors in his history and characteristics favoring release.

Fourth, the Court concludes that releasing David would jeopardize the safety of the community. "Safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (citation modified). The Government argues that

release to a halfway house, even with the conditions outlined in the Release Order, will not suffice to mitigate the danger because of David's serious criminal history and firearm expertise. The Court agrees. David's expertise in assembling firearms poses a danger to the community. As discussed earlier, the evidence shows that David has the skill and experience necessary to assemble perfectly legal, nontraceable components into fully functional firearms. The Court is not convinced that placing David at a halfway house would meaningfully prevent him from acquiring the resources to assemble a firearm. What may appear to be innocent items to the typical observer could actually be potential firearm components to a person of David's level of firearm expertise.

In addition, the Government proffered evidence of the inconsistency between the types of firearms and amount of corresponding ammunition seized at David's home. (Tr. 34:12–23.) It specifically proffered that "the quantity of ammunition found is not consistent with the number of firearms that were found" and that "there were calibers of ammunition found on [the] premises that did not pertain to the firearms that were found." (*Id.*) Compare the amount and types of firearms the agents found with the amount and types of ammunition they found. The rounds of ammunition vastly outnumbered the amount and types of firearms found at David's home.

Based on the Government's argument and proffer, one could very reasonably infer that the numerous rounds of ammunition as compared to the fewer firearms found on David's property is some evidence that David possessed far more firearms than were located on his property. And following this train of thought, that inconsistency means that many of David's nearly 50 firearms are unaccounted for and potentially available to him. No one knows where the extra firearms are and the Court is not convinced that David

would not have access if he were released, a possible scenario which poses a significant danger to the community.

Moreover, Co-Defendant spoke to David's expertise and told the Government that there were "at least 50 firearms on Mr. David's property." (*Id.* at 34:8.) David's counsel sought to minimize Co-Defendant's credibility while bolstering Ex-Partner's credibility by pointing to some contradictions between their statements, such as how Ex-Partner saw David handle firearms but did not believe he could manufacture them. (*Id.* at 58:8–10.) Even so, Co-Defendant and Ex-Partner agreed on at least one fact: Co-Defendant was shot in David's home. (*Id.* at 40–42, 67–68.) Although Ex-Partner did not see David shoot Co-Defendant, (*Id.* at 73:15–18), neither Co-Defendant nor Ex-Partner have stated that anyone other than David was in the home with them at the time of the shooting. Based on this information and the other evidence before the Court, the only possible conclusion could be that David shot Co-Defendant. This shooting, alone, demonstrates the potential danger posed to the public if David were to be released.

Having a stockpile of numerous firearms and firearm parts in a home armory alone demonstrates the danger this Defendant potentially poses to the public. But David's personal arsenal, combined with the fact he possesses decades of skill and expertise which enable him to assemble firearms with lawful, non-traceable parts, makes the danger he poses undeniable.

## IV. CONCLUSION

For all these reasons, the Court ORDERS as follows:

1. The Motion (ECF No. 43) is GRANTED;
2. The Release Order (ECF No. 52) is REVOKED; and

3. David will remain DETAINED without bond pending trial.

Dated this 20th day of November, 2026.

BY THE COURT:

William J. Martínez
Senior United States District Judge